UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

ROBERT F. ROBINSON and          )
MARIO T. ROBINSON,              )
                                )
          Plaintiffs,           )
     v.                         )          CIVIL ACTION
                                )          NO.  10-10188-JGD
TIMOTHY J. COOK, JR., et al.,   )
                                )
          Defendants.           )

## MEMORANDUM OF DECISION AND ORDER
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

March 21, 2012

DEIN, U.S.M.J.

## I.  INTRODUCTION

This action arises out of events surrounding the arrest of the plaintiffs, Robert F.

Robinson ("Robert") and Mario T. Robinson ("Mario"), by officers of the Attleboro,

Massachusetts Police Department following reports of an incident in which two thirteen

year old boys allegedly were verbally harassed by passengers of a passing car, and one of

the boys, the son of an Attleboro police officer, allegedly was struck by the car.  The

plaintiffs deny that they had anything to do with the incident involving the two boys, and

they contend that their arrest occurred without probable cause.  They also contend that

Robert's vehicle was unlawfully seized from his driveway, and that they were subjected

to excessive force in connection with their arrest.  The Robinsons have named as defen-

dants the City of Attleboro ("City" or "Attleboro") and eight individual police officers,

including Timothy Cook, Jr. ("Cook, Jr."), Timothy Cook, Sr. ("Cook, Sr."), Barry

Brewer ("Brewer"), Danish Malhotra ("Malhotra"), James MacDonald ("MacDonald"),

Jeffrey Pierce ("Pierce"), Richard Woodhead ("Woodhead"), and Kevin Fuoco

("Fuoco").  By their Second Amended Complaint, the plaintiffs have asserted claims for

violations of their civil rights under 42 U.S.C. § 1983 ("Section 1983") and the

Massachusetts Civil Rights Act, Mass. Gen. Laws ch. 12, § 11I ("MCRA"), based on

allegations of unlawful arrest, the use of excessive force and the unreasonable seizure of

Robert's automobile (Counts I-III and IX).  Additionally, the plaintiffs have asserted state

law claims for false imprisonment (Count IV), assault and battery (Count V), intentional

infliction of emotional distress (Count VI), aiding and abetting (Count VII), and civil

conspiracy (Count VIII).

The matter is presently before the court on the "Defendants' Motion for Summary

Judgment" (Docket No. 43), by which the defendants are seeking summary judgment on

all of the plaintiffs' claims.  Also before the court are the plaintiffs' cross-motions for

summary judgment (Docket Nos. 49 and 50).  By their motions, both of the plaintiffs are

seeking summary judgment with respect to the civil rights claims asserted against the City

in Count II, and with respect to the claims asserted against Cook, Sr. in Counts I, III, IV,

V and VI, which are based on their allegations of excessive force and unlawful arrest.

Additionally, Robert is seeking summary judgment on the claims asserted against

Malhotra, MacDonald and Fuoco in Counts I, III and VII, which are based on the alleged

unlawful seizure of his automobile.

The plaintiffs have agreed to withdraw all of their claims against defendants Pierce, Brewer and Woodhead, and to dismiss the claim of supervisory liability, which is set forth in Count IX of the Second Amended Complaint.  Accordingly, the defendants' motion for summary judgment will be allowed with respect to those claims, and this court will not address them further.

For all the reasons detailed below, the defendants' motion for summary judgment is ALLOWED IN PART and DENIED IN PART.  Specifically, the motion is denied with respect to the excessive force and assault and battery claims asserted by Mario in Counts I, III and V, the aiding and abetting claim asserted in Count VII, and the claim for civil conspiracy asserted in Count VIII, but is otherwise allowed.  The plaintiffs' cross-motions for summary judgment (Docket Nos. 49 and 50) are both DENIED.

## II.  <u>STATEMENT OF FACTS</u>[1]

The following facts are undisputed unless otherwise indicated.

---

[1]  The facts are derived from the following materials: (1) the Defendant's Statement of Undisputed Facts in Support of Their Motion for Summary Judgment ("DF") and the exhibits attached thereto ("Def. Ex. __") (Docket No. 45); (2) the deposition testimony cited in the Defendants' Statement of Undisputed Facts; (3) the responses set forth on pages 1 through 8 of the Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts ("PR") (Docket No. 51); (4) the Supplemental Undisputed Facts set forth on pages 8 through 13 of the Plaintiffs' Supplemental Statement of Facts in Support of Cross Motion for Summary Judgment ("PF") (Docket No. 51); and (5) the exhibits attached to the plaintiffs' statement of facts ("Pl. Ex. __) (Docket No. 51).

## The Parties

The events giving rise to this litigation occurred on July 12, 2007.  (DF ¶ 3).  At that time, plaintiff Robert F. Robinson was 46 years old, and was living at 60 Lynwood Circle in Attleboro, Massachusetts.  (Pl. Ex. 1 at 1; DF ¶ 1).  Robert's son, plaintiff Mario T. Robinson, was 19 years old and was living at the same address.  (Id.).  The defendant, Cook, Sr., was a Detective for the Attleboro Police Department.  (DF ¶ 4).  The remaining defendants, Cook Jr., Malhotra, MacDonald, and Fuoco, all were Patrolmen with the Attleboro Police Department.  (DF ¶¶ 5, 7, 8, 11).

## The Incident Involving the Two Boys

On July 12, 2007, a 13 year old boy named Christopher Redlund ("Redlund") claimed that he and a friend, 13 year old Nathan Chou ("Chou"), were riding their bikes on Wilmarth Street in Attleboro when a vehicle drove up to them.  (DF ¶ 12; Pl. Ex. 2).  According to the boys, the individual who was sitting in the front passenger seat of the vehicle began to swear at Redlund and Chou.  (See DF ¶ 16; PR ¶¶ 16-17; Pl. Ex. 1 at 1-2).  They further reported that after Redlund told the individual to go away and leave the boys alone, the vehicle drove at Redlund and struck him.  (Pl. Ex. 1 at 2).  Allegedly, the impact from the vehicle caused him to flip over his handlebars and fall to the pave- ment, scraping his entire back. (Pl. Ex. 14 at 13).  Redlund then looked up to see the car speeding away.  (DF ¶ 18; Pl. Ex. 2).

Redlund's father, Alex Aponte ("Aponte"), is a Detective with the Attleboro Police Department.  (DF ¶ 14).[2]  Following the incident on Wilmarth Street, Redlund called his father to tell him what had happened.  (DF ¶ 21).  Aponte, along with defendants MacDonald and Malhotra, responded to the scene and spoke with Redland and Chou.  (DF ¶¶ 22, 29).  During their discussion, both boys told the officers that the offending vehicle was a small, two-door compact car, color silver, and that they had previously seen the vehicle driving in the area of Wilmarth Street.  (Pl. Ex. 1 at 2; PR ¶¶ 18-19).  They also stated that there was a rubber strip hanging from the passenger side of the vehicle, and that the exterior of the car was in poor shape.  (Pl. Ex. 1 at 2-3).  Moreover, Redlund thought the car was a Japanese make, and believed that there had been four dark skinned young males in the vehicle at the time of the incident.  (Id. at 2).  Chou told Aponte that the car looked like a Nissan, and both boys said they would be able to recognize the car if they saw it again.   (PR ¶¶ 18-19; Pl. Ex. 1 at 3).  Although Redlund claims that he had seen a red security warning indicator on the car's center console when the vehicle initially pulled up alongside him, it appears that he did not share that detail with the police officers.  (See DF ¶ 20; Pl. Ex. 1 at 2-3).

---

[2]  Aponte is not a party to this litigation.  According to the plaintiffs, they learned of Aponte's involvement in the investigation "too late in discovery to add him as a defendant" although his alleged involvement is a critical fact according to their summary judgment pleadings. (See Pl. Mem. (Docket No. 52) at 18).

### The Defendants' Investigation

After speaking with the witnesses, the officers began to search for the car.  (DF ¶ 30; PR ¶ 30).  Subsequently, Aponte and defendant Fuoco located a two-door, 1989 Honda Accord sitting in the driveway of the plaintiffs' residence at 60 Lynwood Circle, about a mile away from the location where Redlund had allegedly been struck.  (DF ¶¶ 15, 31, PR ¶¶ 15, 31).   They decided that the car fit the description of the vehicle they were looking for, and they notified the other officers of its location.  (See DF ¶ 31; PR ¶ 31).  The vehicle was registered to the plaintiff, Robert Robinson.  (DF ¶ 31).

According to the defendants, the police officers observed that the passenger side door of the vehicle in the Robinsons' driveway was not fully closed, and that a strip of rubber molding was hanging off its side.  (DF ¶ 33).  They also observed that the exterior of the car was in poor condition.  (DF ¶ 34).  Moreover, the officers determined that the engine of the vehicle was hot, thereby indicating that the car had recently been running.  (DF ¶ 35; Pl. Ex. 13 at 10).

While the police officers were outside the Robinsons' residence, Robert came out of the house and asked what was going on.  (Pl. Ex. 9 at 30-32; Def. Ex. C at Int. No. 3).  MacDonald informed Robert that the officers were investigating a hit and run involving a silver car, possibly a foreign make vehicle.  (DF ¶ 36; PR ¶¶ 36-41).  MacDonald also inquired as to the whereabouts of Robert's son, the plaintiff Mario Robinson, and asked Robert who had been driving the Honda Accord.  (DF ¶ 37; PR ¶¶ 36-41).  Apparently,

MacDonald was familiar with Mario because he had been arrested by Attleboro police officers in the past.  (DF ¶ 37 n.4; Def. Ex. A).

Robert told MacDonald that Mario was getting a haircut.  (Def. Ex. C at Int. No. 3).  However, the parties dispute whether Robert lied to the officers about the plaintiffs' use of the car.  (See DF ¶¶ 38-39; PF ¶ 4).  According to the defendants, Robert initially denied that anyone had been driving the car, but subsequently recanted his statement and said that he and Mario had been in the car earlier, when they commuted home from work together.  (See DF ¶¶ 38-40).  Robert claims, in contrast, that he did not deny using the car, but rather told the officers that it had been sitting in the driveway for about 10 to 20 minutes.  (PR ¶¶ 36-41).

Following the conversation with Robert, the officers had the Honda Accord towed from the Robinsons' driveway to the police station as evidence of the crime of assault and battery with a deadly weapon.  (DF ¶ 42).  It is undisputed that the officers did not obtain a search warrant before towing the car.  (PF ¶¶ 3-4).  According to Malhotra, the police towed the vehicle in order to use it in their ongoing investigation.  (PF ¶ 4).  MacDonald believed it was necessary to tow the car so that it could not be destroyed or tampered with.  (PF ¶ 3).  Both officers agreed that the decision to tow the vehicle was consistent with the policies and procedures of the Attleboro Police Department.  (PF ¶¶ 3-4).

Prior to leaving the Robinsons' residence, the police officers asked that Robert and Mario come to police headquarters in order to be interviewed.  (DF ¶ 43).  No arrests

were made at that time. (DF ¶ 44).  However, as detailed below, the Robinsons subse-

quently went to the police station where they were interviewed and ultimately arrested.

### Identification of the Vehicle

Aponte took Redlund to the police station, where Redlund provided a brief written

statement of what had occurred earlier that day.  (DF ¶¶ 46-47; Pl. Ex. 2).  Therein,

Redlund stated, among other things, that he had been able to get a good look at the

individual who had been sitting in the passenger seat, and at the individual who had been

sitting in the back seat on the passenger side of the vehicle.  (Pl. Ex. 2).  Chou also

reported to the police station.  (See DF ¶ 48; PR 48-51).  It is undisputed that while they

were at the station, both boys identified the car that had allegedly struck Redlund on

Wilmarth Street.  (See id.).

According to Redlund, his father took him outside where there was a row of cars,

and Aponte asked Redlund if he could identify the car that had hit him.  (Pl. Ex. 14 at

32).  Redlund was able to locate the car, which had the rubber piece missing and the red

security warning indicator on the middle console.  (Id. at 32-33).  After Redlund pointed

the vehicle out to his father, Aponte took him back inside the station.  (Id. at 33).

Redlund claims that he had no further conversation with his father while the identification

process was occurring.  (Id.).

Chou claims that after he arrived at the police station, Aponte met him and took

him outside to see if he could identify the car that had struck Redlund.  (Pl. Ex. 15 at 18-

21).  According to Chou, the vehicle in question was in the parking lot, and he identified

the plaintiffs' Honda as the car that had been involved in the incident.  (Id. at 21).  Chou recalled Aponte telling him that the police had caught the driver, and that the car Chou identified matched the description that had been given to the police officers.  (Id. at 19, 21).  However, when Chou was shown a photograph of a suspect whom Aponte described as the driver, Chou was unable to recognize the individual and told Aponte that he could not really make out the driver's face.  (Id. at 21-22).

The plaintiffs contend that the circumstances under which the witnesses' identification of the suspect vehicle occurred constituted "a textbook case of a suggestive show-up or line-up."  (PR ¶¶ 48-51).  The plaintiffs also assert that the identification was improper because Redlund's father was the officer who took the boys to see the car, and because Aponte told the boys that he had the driver and had located the suspect vehicle.  (PR ¶¶ 48-50).  They further contend that the defendants' failure to produce a photograph of the car or the line-up of vehicles used in the identification process supports an inference that the procedure was somehow tainted.  (See id.).  However, contrary to their conclusory assertions that Aponte "show[ed] his son the vehicle to identify," the plaintiffs have presented no evidence to suggest that Aponte told Redlund or Chou which car to identify.  (See Pl. Mem. at 17).  Nor have they provided any basis for suspecting that Aponte would have wanted to implicate the plaintiffs for any reason, or to implicate innocent individuals in a crime against his son.

### The Arrests of the Plaintiffs

The plaintiffs also went to the police station, where they agreed to be interviewed by defendant Cook, Sr.  (Pl. Ex. 16 at 3-4; Pl. Ex. 17 at 3-4).[3]  Prior to conducting the interviews, Cook, Sr. spoke with Redlund and asked him to describe everything that had happened.  (DF ¶ 51).

Mario was taken into the investigation room first.  (DF ¶ 52).  There he was read his *Miranda* rights, asked to give permission for the interview to be videotaped, read a description of the facts of the alleged incident, and interviewed.  (Id.).  During the interview, Redlund was sitting outside the investigation room with his father and several other police officers watching on a closed circuit television.  (See DF ¶ 53; PR ¶ 53; Pl. Ex. 14 at 29-30).  Redlund was aware that the police had identified Mario as a suspect in the incident on Wilmarth Street.  (See Pl. Ex. 14 at 30; PR ¶ 53).

Initially, Redlund was unable to recognize Mario as one of the occupants of the car that had hit him.  (DF ¶ 54).  However, after Mario removed his hat, Redlund noticed that he had the same hairstyle as the person who had been sitting in the passenger seat of the vehicle.  (Id.).  Redlund told his father that Mario "looks like the kid because of his hairstyle."  (Id.).

---

[3]  The transcripts of the interviews with the plaintiffs indicate that the interviews took place at the Haverhill Police Department.  (Pl. Exs. 16 & 17).  However, it is clear from the record that the interviews were performed at the Attleboro Police Department, and that references to Haverhill were the result of a reporting error.  (See Pl. Ex. 17 at 2).

The plaintiffs contend that Redlund's identification of Mario as one of the car's occupants amounted to "a textbook suggestive show-up[.]" (PR ¶ 53). In particular, they take issue with the fact that Redlund was allowed to view the interrogation of an individual who had been identified as a suspect by his own father, while surrounded by police officers. (Id.). The plaintiffs, however, ignore the fact that they were identified as a result of their connection to the vehicle, which was independently identified. Moreover, there was no evidence that Redlund was pressured into identifying Mario, as evidenced by the fact that he did not identify Mario until Mario removed his cap.

During the interview, Mario denied that he had been involved in the alleged incident. (Pl. Ex. 16 at 10-11, 13-14). He explained that he and his father had arrived home from their jobs in Boston at about 4:00 p.m., after which he had gone to get a haircut in Pawtucket, Rhode Island. (Id. at 5, 9-10). Mario also explained that his father had been the only person to drive the Honda Accord that day. (Id. at 9). Cook, Sr. apparently did not credit this statement[4] and placed Mario under arrest for assault and battery with a dangerous weapon. (DF ¶ 57; PR ¶ 57).

After Cook, Sr. completed Mario's interview, Robert was taken into the investigation room. (See Pl. Ex. 17 at 4). Cook, Sr. read Robert his *Miranda* rights, obtained Robert's permission to conduct a videotape interview, and conducted the interview. (Id.

---

[4] Mario's statements were inconsistent with what the officers' reported Robert had stated about the use of the car when first confronted by the police. These alleged inconsistencies were noted by Cook, Sr. in the report he wrote the next day. (See Pl. Ex. 1 at 3-4).

at 3-4).  Although Redlund watched the interview and heard Robert saying he had been

the one driving the car, Redlund was unable to identify Robert as the operator of the

vehicle.  (Pl. Ex. 7 at 34; Pl. Ex. 14 at 38).  Thus, neither of the witnesses identified

Robert as a participant in the alleged crime.

During the interview, Robert asserted that he was the only person who had driven

his car on July 12, 2007, but he denied that he or Mario had been involved in the incident

on Wilmarth Street.  (Pl. Ex. 17 at 8, 15).  While Cook, Sr. credited Robert's statements

that he was the driver of the vehicle at issue, he rejected Robert's assertions of innocence.

(PF ¶ 2).  Accordingly, at the end of the interview, Cook, Sr. placed Robert under arrest

for leaving the scene of personal injury, negligent operation of a motor vehicle, and

assault and battery with a dangerous weapon.  (Pl. Ex. 17 at 19; Pl. Ex. 3).

## The Alleged Use of Force

The plaintiffs claim that during the booking process, Mario was assaulted by

Cook, Sr. And Cook, Jr.[5]  (PR ¶¶ 69-78).  The facts relevant to this claim are in dispute.

According to Mario, after Cook, Sr. arrested him, he was taken to the booking

station where he was allowed to use the telephone.  (Id.).  As Mario was attempting to

---

[5]  In their complaint, the plaintiffs also claimed that Cook, Sr. threatened Robert by
"remov[ing] his firearm from his holster and plac[ing] it menacingly on the table" when the parties
were in the interview room, and that he physically assaulted Robert "by pushing him against the
wall" of an elevator at the police station.  (2nd Am. Compl. (Docket No. 35) ¶¶ 31-32).
However, the plaintiffs have not provided any support for these allegations in their statement of
facts.  Nor do they appear to be pursuing a claim that the defendants used excessive force against
Robert.  (See Pl. Opp. Mem. (Docket No. 52) at 6).

make his call, Cook, Sr. ran over to him and, without explanation, grabbed the phone away and told Mario he was finished with the call.  (Id.).  When Mario told the defendant that he had not completed his call, Cook, Sr. grabbed the plaintiff by the throat and held him against the wall.  (Id.; Pl. Ex. 10 at 45-47).  Three other officers, including Cook, Jr., then came running over to assist their fellow officer.  (PR ¶¶ 69-78).  Although Mario insisted he wasn't doing anything wrong, Cook, Sr., with the help of the other officers, continued to hold Mario against the wall by his throat for several seconds before releasing him.  (Pl. Ex. 10 at 47-48).  Cook, Jr. then smacked Mario in the face for no reason and called him a "cocky bitch" before the officers carried him back to his cell. (PR ¶¶ 69-78).

Robert supports Mario's contention that he was assaulted by the defendants, and that the officers falsely accused Mario of resisting their authority.  (Id.).  However, Robert recalled that it was Cook, Jr. who had snatched the telephone away from Mario as he was attempting to make his call.  (Id.).

The defendants provide a different version of events.  According to the defendants, Mario had used the pay phone in the booking area several times when Cook, Sr. ordered him to step back to the booking desk.  (DF ¶ 71).  However, Mario refused to hang up the phone.  (Id.; Pl. Ex. 1 at 6).  Cook, Sr. then attempted to take the receiver from Mario's hand, and Mario made a motion as if he were going to strike Cook, Sr. with the telephone.  (DF ¶ 72).  Cook, Jr. also was present in the booking area.  (DF ¶ 73).  When he saw what was happening, he grabbed Mario's arm in order to prevent him from hitting

-13-

Cook, Sr.  (Id.).  At that point, according to the defendants, Mario struck Cook, Jr. in the chest with his free hand, and a struggle ensued between the plaintiff and the two officers. (DF ¶¶ 73-74).  The defendants contend that Mario only stopped struggling when the officers threatened to use a pepper spray.  (DF ¶ 74).

Although the circumstances of Mario's confrontation with Cook, Sr. and Cook, Jr. are in dispute, the plaintiffs do not claim that Mario suffered any physical injuries as a result of the incident.  (DF ¶ 82; PR ¶ 82).  It is also undisputed that Mario neither sought nor received any medical care or treatment as a result of the incident.  (DF ¶ 82; PR ¶ 82).

Based on the events that occurred in the booking area, the defendants added a second charge against Mario for assault and battery on a police officer by means of a dangerous weapon.  (See DF ¶ 67).  When the police prosecutor later reviewed the charges against Mario, he crossed out the first charge of assault and battery with a dangerous weapon that had been based on the incident on Wilmarth Street.  (DF ¶¶ 65, 67).  However, he left the second charge arising from the alleged assault on an officer, and also added a charge for disorderly conduct, based on the events that occurred in the booking area.  (Id.).  According to the plaintiffs, those charges, as well as the charges against Robert, were ultimately dismissed by the Attleboro District Court.  (2nd Am. Compl. (Docket No. 35) ¶¶ 35, 37).

Additional factual details relevant to this court's analysis are provided below where appropriate.

# III.  ANALYSIS

## A.  Summary Judgment Standard of Review

Summary judgment is appropriate when the moving party shows, based on the discovery and disclosure materials on file, and any affidavits, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "[A]n issue is 'genuine' if it 'may reasonably be resolved in favor of either party.'"  Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990)).  "A fact is material only if it possesses the capacity to sway the outcome of the litigation under the applicable law." Vineberg, 548 F.3d at 56 (quotations, punctuation and citations omitted).

The moving party bears the initial burden of establishing that there is no genuine issue of material fact.  See Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010).  If that burden is met, the opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial.  LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993), cert. denied, 511 U.S. 1018, 114 S. Ct. 1398, 128 L. Ed. 2d 72 (1994).  Accordingly, "the nonmoving party 'may not rest upon mere allegation or denials of his pleading,'" but must set forth specific facts showing that there is a genuine issue for trial.  Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986)). "Cross-motions for summary judgment do not alter the basic Rule 56 standard, but rather simply require [the court] to determine whether either of the parties deserves judgment as

a matter of law on facts that are not disputed." <u>Adria Int'l Group, Inc. v. Ferre Dev., Inc.</u>, 241 F.3d 103, 107 (1st Cir. 2001). "'When facing cross-motions for summary judgment, a court must rule on each motion independently, deciding in each instance whether the moving party has met its burden under Rule 56.'" <u>Ford v. Clarke</u>, 746 F. Supp. 2d 273, 285 (D. Mass. 2010) (quoting <u>Dan Barclay, Inc. v. Stewart & Stevenson Servs., Inc.</u>, 761 F. Supp. 194, 197-98 (D. Mass. 1991)).

**B.**   <u>**Timeliness**</u>

The defendants contend, as an initial matter, that the plaintiffs' cross-motions for summary judgment should be precluded as untimely because the plaintiffs did not file their motions until 21 days after the deadline for filing motions for summary judgment had passed. (Def. Opp. Mem. (Docket No. 53) at 2-4). Because the plaintiffs filed their cross-motions within the time allowed by this court, they will not be denied on this basis.

On February 8, 2011, this court issued a Scheduling Order in which it directed the defendants to file any motions for summary judgment by June 9, 2011, and ordered the plaintiffs to file any cross-motions "in connection with their oppositions to the defendants' summary judgment motions." (Docket No. 37 ¶ 1.c.). This court subsequently confirmed that schedule in a Scheduling Order dated April 25, 2011. (Docket No. 42 ¶ 2). The defendants filed a timely motion for summary judgment, and on June 28, 2011, the plaintiffs moved for an extension of time, to July 11, 2011, to file both their oppositions to the defendants' motion and their cross-motions for summary judgment. (Docket No. 46). That motion was allowed, and on July 6, 2011, four days before the deadline,

the plaintiffs completed the requisite filing.  (Docket Nos. 49-52).  Thus, the plaintiffs'

cross-motions for summary judgment were timely and will not be precluded.

**C.**     **Counts I and III: Claims Against the Individual Defendants for**
         **Civil Rights Violations Under Section 1983 and the MCRA**

In Counts I and III of their complaint, the plaintiffs have asserted civil rights

claims against the individual defendants under Section 1983 and the MCRA based on the

defendants' alleged violations of their constitutional rights to remain free from unreason-

able seizures, unlawful arrest, and the use of excessive force.  The defendants argue that

they are entitled to qualified immunity with respect to each of these claims, and that

therefore, their motion for summary judgment should be allowed with respect to Counts I

and III.[6]  The plaintiffs dispute that qualified immunity applies, and contend that

summary judgment is warranted in their favor.  For the reasons that follow, this court

finds that disputed issues of fact preclude summary judgment for either party on the

plaintiffs' excessive force claim, but that the defendants have shown that they are entitled

to summary judgment on the claims for unlawful arrest and unreasonable seizure.

**i.**     **Qualified Immunity – In General**

---

[6]  The defendants also argue that Cook, Sr. and Cook, Jr. are entitled to qualified
immunity with respect to the plaintiffs' common law claims against them for assault and battery,
which are set forth in Count V of the complaint.  "Massachusetts law is unsettled regarding the
existence of a state-law concept analogous to federal qualified immunity" for common law claims
for assault and battery.  Raiche v. Pietroski, 623 F.3d 30, 40 (1st Cir. 2010).  Accordingly, this
court will address the assault and battery claim separately below.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed. 2d 396 (1982)). "Qualified immunity balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." Pearson, 555 U.S. 231, 129 S. Ct. at 815 (quotations and citations omitted).

The determination whether an official is entitled to qualified immunity requires an assessment as to whether the facts alleged or shown by the plaintiff "make out a violation of a constitutional right" and, if so, "whether the right at issue was clearly established at the time of defendant's alleged misconduct." Id. at 232, 129 S. Ct. at 816 (quotations and citations omitted). "[T]he second, 'clearly established,' step of the qualified immunity analysis . . . in turn, has two aspects." Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009). As the First Circuit has described:

> One aspect of the analysis focuses on the clarity of the law at the time of the alleged civil rights violation. To overcome qualified immunity, the contours of the right must be sufficiently clear that a

reasonable official would understand that what he is doing violates that right. The other aspect focuses more concretely on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights. Indeed, it is important to emphasize that this inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition.

Id. (quotations, citations and alterations omitted). Thus, "the relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." Id. (quotations, citations and alterations omitted).

"[T]he Supreme Judicial Court of Massachusetts has held that MCRA claims are subject to the same standard of immunity for police officers that is used for claims asserted under § 1983." Raiche v. Pietroski, 623 F.3d 30, 40 (1st Cir. 2010). Thus, the qualified immunity analysis applies equally to the plaintiffs' claims under Section 1983 and their claims under the MCRA. See id. ("Because we have already determined that [the defendant] is not protected by qualified immunity with respect to the § 1983 excessive force claim, we likewise conclude that he is not entitled to qualified immunity against the MCRA claim alleging excessive force").

### ii.   Claims Against Cook, Sr. and Cook, Jr. for Excessive Force

The plaintiffs' claim for excessive force arises out of the events that occurred in the booking area during the course of Mario's arrest, when Mario was allegedly attacked by Cook, Sr. and Cook, Jr. (See Pl. Opp. Mem. (Docket No. 52) at 6). The defendants assert that they are entitled to qualified immunity with respect to this claim because they

did not violate Mario's constitutional rights, and because the defendants' use of force was

reasonable under the circumstances.  (Def. Mem. (Docket No. 44) at 4-7).  Although the

plaintiffs have cross-moved for summary judgment on this claim, they argue that there are

disputed issues of fact relating to the use of excessive force.  (Pl. Opp. Mem. at 6).

Because this court agrees that there are disputed issues of material fact regarding the

question of qualified immunity, neither party is entitled to summary judgment with

respect to the excessive force claim.

### The Existence of a Constitutional Violation

Where "an excessive force claim arises in the context of an arrest, the claim 'must

be analyzed in light of the Fourth Amendment's prohibition of unreasonable seizures.'"

LaFrenier v. Kinirey, 478 F. Supp. 2d 126, 137-38 (D. Mass. 2007) (quoting Gaudreault

v. Municipality of Salem, 923 F.2d 203, 205 (1st Cir. 1990)).  "Determining whether the

force used to effect a particular seizure is 'reasonable' under the Fourth Amendment

requires a careful balancing of the nature and quality of the intrusion on the individual's

Fourth Amendment interests against the countervailing governmental interests at stake."

Graham v. Connor, 490 U.S. 386, 396, 109 S. Ct. 1865, 1871, 104 L. Ed. 2d 443 (1989)

(quotations and citations omitted).  Thus, the critical question is "whether 'the defendant

officer employed force that was unreasonable under the circumstances.'"  Raiche, 623

F.3d at 36 (quoting Jennings v. Jones, 499 F.3d 2, 11 (1st Cir. 2007)).

In applying the test for reasonableness under the Fourth Amendment, courts must

pay "careful attention to the facts and circumstances of each particular case, including the

severity of the crime at issue, whether the suspect poses an immediate threat to the safety

of officers and others, and whether he is actively resisting arrest or attempting to evade

arrest by flight." Graham, 490 U.S. at 396, 109 S. Ct. at 1872.  However, in doing so, it

is important to remain mindful that "[t]he 'reasonableness' of a particular use of force

must be judged from the perspective of a reasonable officer on the scene, rather than with

the 20/20 vision of hindsight." Id.  As the Supreme Court has cautioned,

> [n]ot every push or shove, even if it may later seem unnecessary in
> the peace of a judge's chambers, violates the Fourth Amendment.
> The calculus of reasonableness must embody allowance for the fact
> that police officers are often forced to make split-second judgments
> – in circumstances that are tense, uncertain, and rapidly evolving –
> about the amount of force that is necessary in a particular situation.

Id. at 396-97, 109 S. Ct. at 1872 (internal quotations and citation omitted).

In the instant case, the question whether Cook, Sr. and Cook, Jr. used reasonable

force under the circumstances cannot be resolved on summary judgment.  Under the

defendants' version of events, the officers' use of force was necessitated by Mario's

refusal to obey Cook, Sr.'s order to step back to the booking desk, his effort to strike

Cook, Sr. using the telephone receiver, and his assault on Cook, Jr. as Cook, Jr. was

seeking to prevent him from harming Cook, Sr.  Moreover, that fact that Mario suffered

no physical harm is evidence that the officers used only so much force as was necessary

to restrain the plaintiff and move him back to his cell.  (See Def. Mem. (Docket No. 44)

at 5-6).  Accordingly, if the defendants' version of events is believed, their use of force

was both appropriate and justified by the plaintiff's conduct in resisting arrest and

assaulting a police officer.  See LaFrenier, 478 F. Supp. 2d at 138-39 (finding that police officers' use of force was reasonable where plaintiff resisted arrest, posed an immediate threat to himself and the officers, and plaintiff sustained minimal injuries).

However, the plaintiffs have presented evidence which, if believed, would establish that the defendants attacked Mario by grabbing him by the throat, pinning him against the wall by the throat, and smacking him in the face without any provocation or justification whatsoever.  (See PR ¶¶ 69-78; Pl. Ex. 10 at 45-48).  Under such circumstances, a factfinder could conclude that the defendants' use of force was excessive and violated the plaintiff's constitutional rights.  See Raiche, 623 F.3d at 37 (evidence that officer engaged in unprovoked attack on individual who presented no threat, made no effort to resist arrest, and had merely committed a motor vehicle violation supported conclusion that use of force was unreasonable).  Force may be found to be excessive even if it leaves no "visible cuts, bruises, abrasions or scars."  Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1195 (10th Cir. 2001), and cases cited.

## Whether the Constitutional Right was Clearly Established

The defendants argue that even if Mario's constitutional rights were violated, they are entitled to qualified immunity because that right was not clearly established at the time of the incident in the booking area.  Again, this argument must fail because the relevant facts are in dispute.

In support of their argument that they are entitled to summary judgment under the second prong of the test for qualified immunity, the defendants define the question as

being "whether prior existing case law or general Fourth Amendment  principles gave

Officer Cook, Jr. notice that it was unconstitutional to restrain the hand of a person who

is assaultive and actively resisting arrest and [to threaten the] use of OC [pepper spray]"

to prevent the assaultive behavior.  (Def. Mem. at 6-7).  Obviously, this argument is

premised on the defendants' version of events.  The defendants do not and cannot argue

that the unwarranted use of excessive force against an individual who was posing no

threat and making no attempt to evade or resist arrest was lawful.  See, e.g., Alexis v.

McDonald's Rests. of Mass., Inc., 67 F.3d 341, 353 (1st Cir. 1995) (finding that triable

excessive force claim existed where police officer conducted arrest for trespassing by

violently grabbing plaintiff and dragging her from a booth although she showed no

resistance and posed no threat or risk of flight).  Because it would have been clear to a

reasonable officer, based on the circumstances presented by the plaintiffs, that the

defendants' conduct in attacking Mario for doing nothing more than making a telephone

call was unreasonably excessive, the defendants are not entitled to summary judgment on

the grounds of qualified immunity.

### iii.   **Unlawful Arrest**

The parties also have cross-moved for summary judgment on the plaintiffs' claim

that Cook, Sr. deprived them of their constitutional rights under Section 1983 and the

MCRA by arresting them at the police station without probable cause.  For the reasons

that follow, this court finds that Cook, Sr. had probable cause to arrest both plaintiffs, and

that there was no violation of the plaintiffs' constitutional rights based on their arrest.

Therefore, the court does not need to reach the defense of qualified immunity and the defendants are entitled to summary judgment on the plaintiffs' claims of unlawful arrest.

## Probable Cause

"The Fourth Amendment requires arrests be based on probable cause." Sietins v. Joseph, 238 F. Supp. 2d 366, 375 (D. Mass. 2003). "The probable cause standard is a 'relatively low threshold' for police officers to establish." Id. (quoting White v. Town of Marblehead, 989 F. Supp. 345, 349 (D. Mass. 1997)). It is met "'when police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent person would believe the suspect had committed or was committing a crime.'" United States v. Jones, 432 F.3d 34, 41 (1st Cir. 2005) (quoting United States v. Young, 105 F.3d 1, 6 (1st Cir. 1997)).

The probable cause analysis does not involve consideration of "'the officer's state of mind at the time the challenged action was taken[,]'" but rather "involves 'an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time[.]'" Sietins, 238 F. Supp. 2d at 375 (quoting Alexis, 67 F.3d at 349). Thus, "[t]he inquiry into probable cause focuses on what the officer knew at the time of the arrest, and should evaluate the totality of the circumstances." Jones, 432 F.3d at 41 (internal citation omitted). However, "the probable cause inquiry is not necessarily based upon the offense actually invoked by the arresting officer but upon whether the facts known at the time of the arrest objectively provided probable cause to arrest." Id. "In other words, 'probable cause need only exist as to *any* offense that *could be* charged

under the circumstance.'"  LaFrenier, 478 F. Supp. 2d at 136 (quoting United States v.

Bizier, 111 F.3d 214, 219 (1st Cir. 1997)) (emphasis in original).  "'If reasonable grounds

to arrest exist, probable cause is established and there is no further duty to investigate.'"

Sietins, 238 F. Supp. 2d at 375 (quoting White, 989 F. Supp. at 349).

**Impact of the Identification
Procedures on the Finding of Probable Cause**

The plaintiffs contend that the means by which Redlund and Chou were asked to

identify Robert's car, and Redlund was asked to identify Mario as one of its occupants,

undermined any conclusion that the arrests were based on probable cause.  (See PR

¶¶ 48-51, 53; Pl. Opp. Mem. (Docket No. 52) at 16-17).  Specifically, they argue that the

suggestive nature of the line-up and show-up procedures[7] that were used in the identi-

fication process made it improper for Cook, Sr. to rely on the witnesses' statements in

connection with his decision to arrest the plaintiffs.

This court finds that it was not unreasonable for Cook, Sr. to rely on Redlund's

and Chou's identifications in making his probable cause determination.  As an initial

matter, line-up and show-up procedures such as the ones employed in the instant case are

---

[7]  A "showup" occurs when "a single individual is exhibited to a witness and that witness
is asked whether [he] can identify the individual as the perpetrator of the crime being investi-
gated."  Brodnicki v. City of Omaha, Neb., 874 F. Supp. 1006, 1010 n.4 (D. Neb. 1995), aff'd, 75
F.3d 1261 (8th Cir. 1996).  A "lineup" occurs when a line of individuals is exhibited to a witness
and the witness is asked whether he can identify the perpetrator of the crime.  See id.  In this case,
the plaintiffs are challenging the show-up procedure used to have Redlund identify the plaintiffs
and the line-up procedures used to have Redlund and Chou identify the vehicle that allegedly
struck Redlund on Wilmarth Street.

not in and of themselves improper or unconstitutional, and they "may appropriately be used to establish probable cause." Williams v. City of New York, No. 10-CV-2676 (JG) (LB), 2012 WL 511533, at *8 (E.D.N.Y. Feb. 15, 2012) (slip op.) (finding that use of line-up or show-up procedures, though suggestive, may lawfully be used by police to support an arrest). See also Brodnicki v. City of Omaha, 75 F.3d 1261, 1265 (8th Cir. 1996) (finding "no need to exclude the showup from our probable cause analysis"). Furthermore, the plaintiffs have not shown that the procedures used in this case made it unreasonable for Cook, Sr. to believe that there was probable cause for the plaintiffs' arrests.

As described above, there is no evidence that Aponte or any of the other officers told either of the witnesses which car to identify, or otherwise instructed them to implicate the plaintiffs. See Williams, 2012 WL 511533, at *7-8 (concluding that suggestive lineup procedures were lawful for purposes of evaluating probable cause where "they did not prevent either witness from declining to identify anyone or qualifying their identifications as comparative or tentative"). Indeed, it is undisputed that Redlund was unable to identify Robert during the showup that occurred while Robert was in the interview room, and that Chou was unable to recognize the driver of the vehicle when presented with a photograph of the suspect. (See Pl. Ex. 7 at 34, Pl. Ex. 14 at 38; Pl. Ex. 15 at 21-22). The fact that the witnesses declined to implicate Robert, even though they knew he was suspected of being the driver of the vehicle that had hit Redlund, shows that

the identification process was not so suggestive as to undermine the reliability of the

witnesses' statements.

Additionally, courts that have considered whether a challenged procedure

undermines the reliability of an identification for purposes of the probable cause inquiry

have considered such factors as

> "the opportunity of the witness to view the suspect during the
> commission of the crime; the witness' degree of attention; the
> accuracy of the witness' prior description of the suspect; the level of
> certainty demonstrated by the witness at the confrontation; and the
> length of time between the crime and the confrontation."

Pace v. City of Des Moines, 201 F.3d 1050, 1057 (8th Cir. 2000) (quoting Brodnicki, 75

F.3d at 1265).

Here, the record establishes that the identifications occurred on the same day as

the incident at issue, the witnesses had previously described the vehicle and its occupants

to the police, and Redlund and Chou separately identified the car with a high degree of

certainty.  Furthermore, it is undisputed that Redlund had been able to get a good look at

the passenger at the time of the incident, and was able to recognize Mario as the

passenger once Mario took off his hat at the police station.  Under such circumstances,

the witness identifications of both Mario and the vehicle were "sufficiently probative to

allow a reasonable officer to believe that probable cause existed."  Pace, 201 F.3d at 1057

(finding that victim's identification of suspect during showup was sufficiently reliable to

support probable cause for arrest where victim had prior opportunity to view her attacker,

provided detailed description of him, identified attacker within 24 hours after crime

occurred, and identified suspect with high level of certainty).  See also Brodnicki, 75 F.3d

at 1265-66 (finding it reasonable for police officers to rely on show-up identification in

connection with probable cause determination where witness had prior opportunity to

observe suspect, provided detailed description of suspect and his car, and was certain in

her identification of suspect at the show-up, which took place on same day as alleged

crime).  Consequently, the plaintiffs have not shown that the identification procedures

rendered the plaintiffs' arrests unlawful.

This court's conclusion is not altered by the fact that Redlund's father oversaw the

witnesses' identification of Robert's vehicle and was present during Redlund's identifica-

tion of Mario as a perpetrator.  While it doubtlessly would have been preferable if Aponte

had left the investigation to others, there is no evidence that he said anything during the

identification process to call the reliability of the witnesses' statements into doubt.

Accordingly, the witness identifications were sufficient to support a reasonable conclu-

sion that probable cause existed for the plaintiffs' arrests.

### The Arrest of Mario Robinson

The plaintiffs argue that even if the show-up and line-up procedures were not

unduly suggestive, Cook, Sr. nevertheless had no probable cause for the initial arrest of

Mario on charges of assault and battery with a dangerous weapon because there was no

evidence that Mario was operating the vehicle at the time it struck Redlund and knocked

him off his bike.  (Pl. Opp. Mem. at 4-5).  This court disagrees and finds that Cook, Sr.

had probable cause to arrest Mario based on the evidence placing him in the car yelling at

the boys immediately before the car allegedly hit Redlund.  Consequently, the plaintiffs cannot establish that Mario's arrest was invalid.

It is undisputed that following his interview at the police station, Mario was arrested for assault and battery by means of a dangerous weapon pursuant to Mass. Gen. Laws ch. 265, § 15A.  (Pl. Ex. 4).  That statute makes it a crime where a person "is 17 years of age or older and, by means of a dangerous weapon, commits an assault and battery upon a child under the age of 14[.]"  Mass. Gen. Laws ch. 265, § 15A(c)(iv). Significantly, the crime described in § 15A requires "an intentional, unjustified touching, however slight, by means of [a] dangerous weapon."  Commonwealth v. Appleby, 380 Mass. 296, 306, 402 N.E.2d 1051, 1058 (1980).  Thus, there must be an intent "to commit assault with an object capable of causing bodily harm" and "the application of force upon the victim by means of the instrumentality."  Id. at 308, 402 N.E.2d at 1059.

The record shows that at the time of Mario's arrest, the evidence available to Cook, Sr. indicated that Mario was occupying the front passenger seat of the car that struck Redlund on Wilmarth Street.  Both Mario and Robert insisted that Robert had been the only person who had driven Robert's car that day, and Redlund identified Mario as the person who had been sitting in the passenger seat at the time of the incident.  Consequently, a reasonably prudent person would not have believed that Mario had the requisite intent to commit the crime set forth in Mass. Gen. Laws ch. 265, § 15A(c)(iv). However, the fact that Cook, Sr. may not have had probable cause to arrest Mario for the crime with which he was charged initially does not end this court's inquiry.

As described above, the arrest was still valid if Cook, Sr. had probable cause to arrest Mario for any crime.  See Jones, 432 F.3d at 41 (finding that for purposes of probable cause, it was irrelevant that booking officer cited defendant for a specific crime, as long as "there was probable cause to believe he was committing another crime").  This court finds, based on the undisputed facts in the record, that Cook, Sr. had probable cause to arrest Mario as an aider and abettor, or as a conspirator, in an assault and battery by means of a dangerous weapon.  Therefore, the plaintiffs' challenge to Mario's arrest must fail.

"The Massachusetts aiding and abetting statutes reads: 'Whoever aids in the commission of a felony, or is accessory thereto before the fact by counselling, hiring, or otherwise procuring such a felony to be committed, shall be punished in the manner provided for the punishment of the principal felon.'"  United States v. Marino, 277 F.3d 11, 30 (1st Cir. 2002) (quoting Mass. Gen. Laws ch. 274, § 2).  The "Massachusetts aiding and abetting statute is a statute of general application," which applies to any criminal offense.  Id.  In order "to prove a defendant guilty of aiding and abetting a crime, the state must prove that 'someone committed the prohibited act, and that the defendant intentionally assisted the principal in the commission of the crime while sharing the mental state required for the crime.'"  Id. at 31 (quoting Commonwealth v. Filos, 420 Mass. 348, 649 N.E.2d 1085, 1089 (1995)).

A conspiracy under Massachusetts law consists of "a 'combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose.'"

Commonwealth v. Lonardo, 74 Mass. App. Ct. 566, 568-69, 908 N.E.2d 831, 835 (2009)

(quoting Commonwealth v. Beneficial Fin. Co., 360 Mass. 188, 249, 275 N.E.2d 33

(1971)).  A conspiracy "is complete when an agreement for a criminal purpose, express or

tacit, is formed, although the details of the agreement have not been worked out."

Commonwealth v. Stack, 49 Mass. App. Ct. 227, 235, 728 N.E.2d 956, 963 (2000)

(internal citations omitted).  However, it is not necessary that "all the conspirators be

equally cognizant of every part of what has been agreed or what is afoot."  Id. (internal

citation omitted).  Instead, "the prosecution need only prove that a defendant charged as a

conspirator knew the 'essential features' and 'general aims' of the venture."  Id. (quoting

United States v. Williams, 809 F.2d 75, 86 (1st Cir. 1986)).

At the time of Mario's arrest in the instant case, Cook, Sr. had evidence indicating

that even if Mario was not driving the car, his role in the alleged incident was not merely

that of a passive observer.  Rather, the evidence indicated that the car which struck

Redlund belonged to Mario's father, that the passenger, identified as Mario, had been

shouting verbal epithets at Redlund just moments before the car struck Redlund, and that

the car struck Redlund immediately after Redlund responded to the shouting by telling the

passenger to go away.  (See DF ¶ 16; PR ¶¶ 16-17; Pl. Ex. 1 at 1-2).  Additionally,

neither the passenger nor any of the other occupants of the car attempted to assist

Redlund after he was stricken.  On the contrary, when Redlund looked up after having

fallen, the car was speeding away.  (DF ¶ 18; Pl. Ex. 2).  Based on this evidence, it would

have been reasonable for Cook, Sr. to infer that Mario targeted Redlund with an intent to

harm or at least scare him, and that Mario supported the driver's decision to hit Redlund after Redlund told Mario to go away.  Thus, it would have been reasonable for Cook, Sr. to believe that Mario agreed to or intentionally assisted in the hit and run.  Accordingly, this court finds that Cook, Sr. had probable cause to arrest Mario for aiding and abetting or conspiring to commit an assault and battery by means of a dangerous weapon.

### The Arrest of Robert Robinson

This court also finds that Cook, Sr.'s arrest of Robert Robinson was based on probable cause.  It is undisputed that at the time of the arrest, both Redlund and Chou had positively identified Robert's car as the one that struck Redlund on Wilmarth Street.  In addition, both Robert and Mario told Cook, Sr. that Robert had been the only person who had driven the car that day.  Moreover, while the facts relating to Robert's conversation with the police officers in front of his house are in dispute, the officers who spoke with Robert reported that he initially denied using the car on the day of the incident, but later recanted and admitted to having driven it.  (See Pl. Ex.1 at 3-4).  Based on all of this information, it was reasonable for Cook, Sr. to conclude that Robert had committed a crime.

The plaintiffs nevertheless argue that probable cause was lacking because Cook, Sr. selectively relied on the plaintiffs' statements that Robert was the only person who had driven the car, but chose to ignore their assertions that he had been using it for work and had no involvement in the incident at issue.  (Pl. Opp. Mem. at 7-9).  This court disagrees.  First of all, Cook, Sr. "had no obligation to give credence to [the plaintiffs']

-32-

self-serving statements.  A reasonable police officer is not required to credit a suspect's

story."  Cox v. Hainey, 391 F.3d 25, 32 n.2 (1st Cir. 2004).  Secondly, as described

above, the inquiry into probable cause "must take into account the totality of the

circumstances."  LaFrenier, 478 F. Supp. 2d at 136.  In light of the fact that Robert's car

matched the description of the vehicle that had been provided by Redlund and Chou, both

witnesses had positively identified the car as the vehicle that struck Redlund, and

Redlund had identified Mario as the person who had been sitting in the passenger seat, it

was entirely reasonable for Cook, Sr. to reject the plaintiffs' claims that they had no

involvement in the incident, and to conclude that Robert had been involved in the crime.

Accordingly, the defendants are entitled to summary judgment with respect to Robert's

claim for unlawful arrest.

### iv.    Alleged Unlawful Seizure of Robert's Vehicle

The parties also have cross-moved for summary judgment on the plaintiffs' claim

that MacDonald, Fuoco and Malhotra violated Robert's civil rights by having his vehicle

towed from his driveway.  The plaintiffs assert that the defendants' conduct constituted

an unreasonable seizure of his property in violation of his constitutional rights, whereas

the defendants contend that the towing of Robert's vehicle was lawful because the vehicle

was seized as evidence of a crime based on the statements of Redlund and Chou.  For the

reasons discussed below, this court concludes that the seizure was reasonable and did not

violate Robert's constitutional rights.  Therefore, the court again does not need to reach

the defense of qualified immunity as to this claim.

A seizure conducted without a warrant is "*per se* unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." Coolidge v. New Hampshire, 403 U.S. 443, 455, 91 S. Ct. 2022, 2032 (1971) (quotations and citation omitted). "The exceptions are jealously and carefully drawn, . . . and the burden is on those seeking the exemption to show the need for it." Id. (quotations, citations and alteration omitted). One such exception, the so-called "automobile exception," allows for a warrantless search or seizure of a motor vehicle parked in a public place so long as there is "'probable cause to believe that the [vehicle] contains contraband or other evidence of criminal activity.'" United States v. McCoy, 977 F.2d 706, 710 (1st Cir. 1992) (quoting United States v. Panitz, 907 F.2d 1267, 1271 (1st Cir. 1990)) (alteration in original). However, where the vehicle is parked on private property, including in an individual's driveway, there also must be "exigent circum- stances" such that "it is not practicable to secure a warrant[.]" Coolidge, 403 U.S. at 460- 62, 91 S. Ct. at 2035-36. Thus, "[a] warrantless seizure of an automobile [from private property] is reasonable if there is 'probable cause that [the] automobile contains evidence or fruits of a crime plus exigent circumstances.'" United States v. Swanson, 341 F.3d 524, 531 (6th Cir. 2003) (quoting United States v. Beck, 511 F.2d 997, 1001 (6th Cir. 1975)) (internal quotations omitted).

This court finds that in the instant case, there existed both probable cause and exigent circumstances to support the police officers' seizure of Robert's vehicle. Specifically, this court finds that the officers had probable cause to believe Robert's

vehicle had been involved in a crime because it matched the witnesses' description of the vehicle that had been involved in the incident on Wilmarth Street.  See Swanson, 341 F.3d at 532 (finding that federal agents had probable cause to seize automobile without a warrant because vehicle had been used thirty days earlier to deliver automatic weapon to confidential informant); Capraro v. Bunt, 44 F.3d 690, 691 (8th Cir. 1995) (finding that officers had probable cause to seize truck from suspect's driveway because it matched victim's description of vehicle used in a crime).  This court also concludes that there were exigent circumstances to justify the seizure because there was a possibility that the plaintiffs could have driven the car away and hidden, altered or disposed of it before a warrant was issued.  The undisputed facts establish that when the officers spoke to Robert at his home, they indicated that they suspected his car had been used in a hit and run, and that Robert's son Mario had been involved in the incident.  It is also undisputed that no arrests were made at that time.  Accordingly, the plaintiffs had an opportunity to abscond with the vehicle, and the officers were justified in having it towed to the police station. See Swanson, 341 F.3d at 532-33 (finding that exigent circumstances justified warrantless seizure of vehicle where suspect was not arrested and "would have been free to drive the car away, and perhaps destroy or dispose of evidence, or even the car itself").

The plaintiffs argue that the seizure was nevertheless invalid because "[t]he police had no probable cause to believe that the silver foreign car parked on the Plaintiffs' driveway was the one involved in the incident at issue instead of the hundreds of silver foreign cars parked or being driven in Attleboro on the date and time at issue[.]"  (Pl.

-35-

Opp. Mem. at 12).  However, it is undisputed that Redlund and Chou provided additional

details of the suspect vehicle, including that it was a Japanese make, two-door compact

car, which was in poor shape, and was distinguishable because there was a rubber strip

hanging from the passenger side of the vehicle.  (Pl. Ex. 1 at 2; PR ¶¶ 18-19).  Addition-

ally, they stated that they had seen the vehicle driving in the area before, thereby indi-

cating that the car likely belonged to someone living nearby.  (Pl. Ex. 1 at 2).  Moreover,

when the officers arrived at the plaintiffs' residence and found a car matching the

witnesses' description, including a piece of rubber molding hanging off its side, they

were able to confirm by the temperature of the engine that the car had recently been

driven.  (See DF ¶¶ 33-35; Pl. Ex. 13 at 10).  Given the circumstances presented, the

officers were reasonable in believing that Robert's car was the one which had been used

to hit Redlund.       The plaintiffs' argument that no exigent circumstances were present

to justify a warrantless seizure is equally unpersuasive.  "The Supreme Court has noted

that 'the mobility of automobiles creates circumstances of such exigency that, as a

practical necessity, rigorous enforcement of the warrant requirement is impossible.'"

Swanson, 341 F.3d at 533 (quoting California v. Carney, 471 U.S. 386, 391, 105 S. Ct.

2066, 2069, 85 L. Ed. 2d 406 (1985)) (punctuation omitted).  Thus, although there was no

affirmative evidence that the plaintiffs intended to alter or destroy the car, the fact that

they knew of the police officers' suspicions and would have had an opportunity to do so

was sufficient to justify a warrantless seizure.  See Coolidge, 403 U.S. at 460, 91 S. Ct. at

2035 (explaining that where probable cause is present, exigent circumstances justify

warrantless searches of vehicles on highway "because the car is movable, the occupants

are alerted, and the car's contents may never be found again if a warrant must be

obtained.") (quoting <u>Chambers v. Maroney</u>, 399 U.S. 42, 51, 90 S. Ct. 1975, 1981, 26 L.

Ed. 2d 419 (1970)) (internal quotations omitted).  Of course, the police could have stood

just outside the plaintiffs' property and watched over the car while a warrant was

obtained, as the plaintiffs suggest, but "that is no less of an intrusion than the seizure . . .

of the car." <u>Swanson</u>, 341 F.3d at 533.  Accordingly, the record demonstrates that the

warrantless seizure of Robert's vehicle was lawful and that summary judgment is

warranted in the defendants' favor with respect to this claim.

### D.    Count II: Claim Against the City of Attleboro Under Section 1983

In Count II of the Second Amended Complaint, the plaintiffs have alleged a claim

against the City of Attleboro pursuant to Section 1983.  Each of the parties has moved for

summary judgment on this claim as well.  Because this court finds that the plaintiffs have

presented no evidence to show that the City maintained a policy or custom which caused

the plaintiffs to be deprived of their constitutional rights, the City is entitled to judgment

as a matter of law.

The Supreme Court has long held that "a local government may not be sued under

§ 1983 for an injury inflicted solely by its employees or agents." <u>Monell v. Dep't of Soc.</u>

<u>Servs. of N.Y.</u>, 436 U.S. 658, 694, 98 S. Ct. 2018, 2037, 56 L. Ed. 2d 611 (1978).

"Instead, it is when execution of a government's policy or custom . . . by those whose

edicts or acts may fairly be said to represent official policy, inflicts the injury that the

government as an entity is responsible under § 1983." Id. at 694, 98 S. Ct. at 2037-38.

Therefore, a plaintiff seeking to impose liability on a municipality under Section 1983

must "demonstrate both the existence of a policy or custom and a causal link between that

policy and the constitutional harm." Santiago v. Fenton, 891 F.2d 373, 381 (1st Cir.

1989). Here, the plaintiffs have failed to make the requisite showing.

### Alleged Policy Relating to Seizures of Property

In support of their claim for municipal liability, the plaintiffs first argue that the

City maintained a policy which allowed police officers to seize vehicles from private

property without any legal justification. (Pl. Opp. Mem. at 15). Although the record

indicates that the defendants' decision to tow Robert's vehicle from his driveway was

consistent with the policies and procedures of the Attleboro Police Department, (PF ¶¶ 3-

4), as detailed above, the plaintiffs have not shown that any such policy caused them to

be deprived of their constitutional rights. Accordingly, the City is entitled to judgment as

a matter of law on this claim.

### Alleged Custom of Conducting Suggestive Show-Ups and Line-Ups

The plaintiffs also are seeking to hold the City liable under Section 1983 based on

an alleged custom of allowing suggestive show-ups and line-ups. Again, however, the

plaintiffs have not established the existence of a custom that caused the plaintiffs to be

deprived of their constitutional rights.

To the extent the plaintiffs are arguing that a custom of using such procedures

deprived them of their rights to due process, they have not presented any evidence to

support such a claim.  First of all, as described supra, and as the plaintiffs concede in

their opposition brief, there is no constitutional right to be protected from a suggestive

identification.  See Wray v. City of New York, 490 F.3d 189, 193 (2d Cir. 2007).  Rather,

"'[s]uggestive procedures are disapproved because they increase the likelihood of

misidentification, and it is the admission of testimony carrying such a likelihood of

misidentification which violates a defendant's right to due process.'"  Id. (quoting Wray v.

Johnson, 202 F.3d 515, 524 (2d Cir. 2000)) (quotations and citation omitted).  As the

Wray court explained:

> In the context of an identification following a police procedure that
> was impermissibly suggestive, the due process focus is principally
> on the fairness of the trial, rather than on the conduct of the police,
> for a *suggestive procedure "does not itself intrude upon a
> constitutionally protected interest."*

Wray, 202 F.3d at 524 (quoting Manson v. Braithwaite, 432 U.S. 98, 113 n.13, 97 S. Ct.

2243, 2252 n.13, 53 L. Ed. 2d 140 (1977) (emphasis added by Wray court).  See also

Velez v. Schmer, 724 F.2d 249, 251 (1st Cir. 1984) (considering whether circumstances

of out-of-court identification procedure was so unnecessarily suggestive that it led to a

due process violation at trial).  Since in the instant case it is undisputed that no trial

occurred, the plaintiffs' claim of a suggestive identification in connection with an arrest

does not state a basis for § 1983 liability.

Even more importantly, as detailed above, this court has considered the issue in

connection with the plaintiffs' unlawful arrest claims, and has determined that the

identification procedures used in this case were sufficiently reliable to support the

plaintiffs' arrests.  Since the police practices were not unconstitutional, the plaintiffs have

not shown that such a practice supports their claim for municipal liability.

**Alleged Policy of Allowing Conflicts of Interest**

Finally, the plaintiffs claim that the City should be held liable because it  main-

tained a policy or practice of condoning conflicts of interest, which led to the violation of

the plaintiffs' constitutional rights.  (See Pl. Opp. Mem. at 18).  However, as detailed

above, the plaintiffs have not presented any facts to establish that Aponte's participation

in the investigation of the incident involving his son rendered the plaintiffs' arrests

invalid or otherwise caused them harm.[8]  Therefore, even if it were assumed that the

Attleboro Police Department had a policy or custom of condoning conflicts of interest,

the plaintiffs cannot show that such policy or custom resulted in a constitutional

violation.  Accordingly, the City is entitled to summary judgment with respect to Count

II.

### E.  Count IV: Claim for False Imprisonment

---

[8]  The plaintiffs' reliance on the Supreme Court's decision in DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989) and on the Sixth Circuit's decision in Sheets v. Mullins, 287 F.3d 581 (6th Cir. 2002) to show that Aponte's involvement in the investigation violated the plaintiffs' due process rights is misplaced.  Those cases address whether a state actor can be liable for harm caused by a third party.  See DeShaney, 489 U.S. at 197, 109 S. Ct. at 1004 (no constitutional violation where Department of Social Services failed to protect child from beatings by his father: "a State's failure to protect an individual against private violence does not constitute a violation of the Due Process Clause"); Sheets, 287 F.3d at 588 (police officer granted qualified immunity on claim that he failed to intervene to prevent infant's death at the hands of her father).  They do not address the situation before this court, namely whether a municipality may be liable as a result of a state actor's conduct.

The parties have cross-moved for summary judgment with respect to the plaintiff's claim of false imprisonment, which is asserted in Count IV of their complaint.  Under Massachusetts law, the tort of "[f]alse imprisonment consists of '(1) intentional and (2) unjustified (3) confinement of a person, (4) directly or indirectly (5) of which the person confined is conscious or is harmed by such confinement.'"  Sietins, 238 F. Supp. 2d at 381 (quoting Ball v. Wal-Mart, 102 F. Supp. 2d 44, 55 (D. Mass. 2000)).  "Police officers may be liable for this tort 'unless the police officer had a legal justification' for the restraint."  Sietins, 238 F. Supp. 2d at 381 (quoting Rose v. Town of Concord, 971 F. Supp. 47, 51 (D. Mass. 1997)).  Such justification exists where "the officer had probable cause to arrest the suspect."  Sietins, 238 F. Supp. 2d 381.  Because this court has found that both the plaintiffs' arrests were based on probable cause, summary judgment is allowed for the defendants with respect to Count IV.

### F.      Count V: Claim for Assault and Battery

In Count V, the plaintiffs are seeking to hold Cook, Sr. and Cook, Jr. liable for assault and battery under state law.  Again, the parties have cross-moved for summary judgment on this claim.  "Assault and battery is the 'intentional and unjustified use of force upon the person of another, however slight, or the intentional doing of a wanton or grossly negligent act causing personal injury to another.'"  Id. at 380 (quoting Jesionowski v. Beck, 937 F. Supp. 95, 105 (D. Mass. 1996)).  Under Massachusetts law, "'an officer authorized to make an arrest may use such force as is reasonably necessary to effect the arrest.'"  Id. (quoting Julian v. Randazzo, 380 Mass. 391, 396, 403 N.E.2d 931, 934

(1980)) (punctuation omitted).  Where, as here "a plaintiff alleges both a § 1983 excessive force claim and common law claims for assault and battery, [the] determination of reasonableness of the force used under § 1983 controls [the] determination of reason-ableness of the force used under the common law assault and battery claims."  Raiche, 623 F.3d at 40.  Because, as detailed above, the relevant facts relating to the use of excessive force against Mario are in dispute, both parties' motions for summary judgment must be denied with respect to the assault and battery claim.

The defendants' argument that qualified immunity protects them from liability for assault and battery does not alter this court's conclusion that they are not entitled to judgment as a matter of law.  (See Def. Mem. at 3).  "Massachusetts law is unsettled regarding the existence of a state-law concept analogous to federal qualified immunity." Raiche, 623 F.3d at 40.  Moreover, even if the doctrine of qualified immunity were deemed to apply to protect the defendants from liability for assault and battery, the defendants have not shown that they are entitled to such immunity at the summary judgment stage.  Accordingly, they are not entitled to summary judgment with respect to Count V.

### G.    Count VI: Claim for Intentional Infliction of Emotional Distress

In Count VI, the plaintiffs allege that the individual defendants should be held liable for the intentional infliction of emotional distress.  Both the plaintiffs and the defendants have moved for summary judgment on this claim.  For the reasons that follow, this court finds in favor of the defendants on Count VI.

-42-

In order to prevail on their claim for intentional infliction of emotional distress, the plaintiffs "must prove '(1) that the defendant intended to cause, or should have known that his conduct would cause, emotional distress; (2) that the defendant's conduct was extreme and outrageous; (3) that the defendant's conduct caused the plaintiff's distress; and (4) that the plaintiff suffered severe distress.'" Sietins, 238 F. Supp. 2d at 379 (quoting Howcroft v. City of Peabody, 51 Mass. App. Ct. 573, 596, 747 N.E.2d 729, 747 (2001)) (additional citation omitted). Where police officers "merely carr[y] out their obligations as law enforcement officials[,] . . . their conduct 'as a matter of law cannot be deemed extreme and outrageous.'" Id. (quoting Sena v. Commonwealth, 417 Mass. 250, 264, 629 N.E.2d 986, 994 (1994)). Thus, the only facts which could potentially give rise to liability for intentional infliction of emotional distress in this case concern the alleged attack on Mario in the booking area of the police station. Because this court finds that the plaintiffs have failed to present any evidence showing that Mario suffered severe distress as a result of that incident, the plaintiffs cannot prevail on this claim, and the defendants are entitled to judgment as a matter of law.

Although medical or psychiatric evidence is not necessary to establish the fourth element of a claim for intentional infliction of emotional distress, there must be some evidence by which a jury could reasonably infer that the plaintiff suffered severe distress. See Poy v. Boutselis, 352 F.3d 479, 485-86 (1st Cir. 2003) (although plaintiff presented no medical or psychiatric evidence, jury could reasonably infer a condition of severe emotional distress based on severity of attack and resulting injuries). Here, the plaintiffs

have not submitted sufficient evidence to support such an inference.  The evidence

submitted by the plaintiffs, if credited, shows at most that the incident in the booking area

consisted of the defendants holding Mario against the wall by his throat and pinning him

against the wall for several seconds before Cook, Jr. slapped him in the face and called

him a "cocky bitch."  (PR ¶¶ 69-78).  Thus, even if the plaintiffs' version of events were

accepted as true, it would establish that the incident was brief, and that Mario suffered no

apparent injuries.  Indeed, it is undisputed that Mario suffered no physical harm, and

sought no treatment or medical care following his release from custody.  (DF ¶ 82; PR

¶ 82).  Moreover, Mario has not presented any facts showing that he experienced any

emotional distress, much less severe emotional distress, as a result of the alleged attack.

This court finds that even when accepted as true, a jury viewing these circumstances

could not reasonably conclude that Mario is entitled to prevail on his claim of emotional

distress.  Therefore, the defendants' motion is allowed with respect to Count VI.

### H.    Count VII: Claim for Aiding and Abetting

In Count VII, the plaintiffs have asserted claims against the individual defendants

for aiding and abetting in connection with the alleged violations of their constitutional

and state law rights.  Robert has moved for summary judgment against Malhotra,

MacDonald and Fuoco on Count VII based on the alleged illegal seizure of his

automobile.  (Mot. (Docket No. 49) ¶ 2).  Because he has failed to withstand summary

judgment on the underlying claim of unlawful seizure, his motion likewise must fail on

the claim for aiding and abetting.

The defendants also have moved for summary judgment on Count VII on the grounds that such claims are derivative of the plaintiffs' civil rights and state law tort claims, and they did nothing to violate the plaintiffs' constitutional or state law rights. (Def. Mem. at 16). However, because this court has found that there are disputed issues of fact which preclude summary judgment for the defendants on the excessive force and assault and battery claims, the defendants' motion for summary judgment on Count VII must be denied as well.

### I.     Count VIII: Claim for Civil Conspiracy

The final claim, set forth in Count VIII of the complaint, consists of a claim against the individual defendants for civil conspiracy. As in the case of the aiding and abetting claim, the defendants have moved for summary judgment on Count VIII on the grounds that it is premised upon the other claims, and they have done nothing to violate the plaintiffs' federal or state law rights. (Def. Mem. at 16). Because this court finds that the excessive force and assault and battery claims survive summary judgment, the defendants' motion is denied with respect to the claim of civil conspiracy.

### IV.  CONCLUSION

For all the reasons detailed herein, the "Defendants' Motion for Summary Judgment" (Docket No. 43) is ALLOWED IN PART and DENIED IN PART. Specifically, the motion is denied with respect to the excessive force and assault and battery claims asserted by Mario in Counts I, III and V, the aiding and abetting claim asserted in Count VII, and the claim for civil conspiracy asserted in Count VIII, but is otherwise allowed.

The plaintiffs' cross-motions for summary judgment (Docket Nos. 49 and 50) are both

DENIED.

                                          / s / Judith Gail Dein
                                         Judith Gail Dein
                                         United States Magistrate Judge